**Richard W. BIRD, Appellant,**

v.

**DuPONT GLORE FORGAN, INC., Appellee.**

**No. 8382.**

District of Columbia Court of Appeals.

Argued Oct. 23, 1974.

Decided March 5, 1975.

Paul G. Evans, Washington, D. C., for appellant.

Robert M. Dougherty, Washington, D. C., for appellee.

Before KELLY, KERN and NEBEKER, Associate Judges.

KELLY, Associate Judge:

DuPont Glore Forgan, Inc. (DuPont), a brokerage house, sued Richard W. Bird for a balance of $1,725.70 said to be due as a result of losses incurred in a commodities trading account which Bird had previously had with the firm. DuPont alleged that when the balance in Bird's ac-

count fell below the amount of margin required to continue trading, the account was closed with a deficit of $1,725.70.[1] Appellant claimed that he had provided ample funds to maintain an adequate margin in the account by delivering a $2,000 check to DuPont in mid-June of 1970 but, because of unauthorized transactions undertaken by the firm, he was later obliged to stop payment on the check. He counterclaimed for damages of $1,875 supposedly sustained as a result of the various unauthorized transactions. The trial court found for DuPont on both claims and we affirm.[2]

The following sequence of events was developed at trial. On June 15, 1970, Bird delivered a check for $2,000 to DuPont as a general tender towards his account. The money represented the amount of margin necessary to cover short sales made for Bird by DuPont.[3] On June 16, Bird sold short one July copper contract at 65.9 cents per pound. Again, on June 17, he sold short a July copper contract at 65.5 cents per pound. That same day he received a call from DuPont informing him that there were rumors of a strike at one of the copper mines and that the two July short positions were under heavy pressure and "limited up against [him]"; i. e., the price of copper was rising and it would be difficult to cover (purchase) contracts to complete these transactions at prices lower than those at which he had sold them short. In effect, DuPont asked for permission to buy in two July copper contracts to protect Bird's short positions and it did purchase two July copper contracts that day for Bird's account, both at 68.05 cents per pound.

Bird claims he was first notified of the above transactions on June 19, 1970 by a written notice of execution. He testified that he then stopped payment of the check for $2,000. The check was returned to DuPont on June 22 and posted by it as a debit to Bird's account on June 23. At that point, all of the transactions in Bird's account had been completed and all trading ceased.

Bird claimed at trial that he had not authorized the purchase of the two copper contracts in dispute and that when DuPont telephoned him on June 17 with regard to his short positions in July copper, he had merely instructed them "to do nothing". At the close of all the testimony the trial court found with respect to DuPont's complaint that Bird had not proved that the futures contracts were bought without consulting him since he did not establish that he ever contacted anyone at DuPont who could carry out his orders. As to Bird's counterclaim, the trial court found no evidence of loss and entered judgment for DuPont.

■ Bird's defense to DuPont's original claim and his counterclaim depend on the same issue—whether or not the purchases of the two July copper contracts were authorized. And as to this issue we are in agreement that in response to testimony for DuPont that they were, Bird failed to produce evidence of sufficient weight to convince the court that authorization was lacking. Under questioning by the court, Bird testified that although the person with whom he had spoken regarding these

1. Evidence of the indebtedness consisted of accounting statements of DuPont, copies of which had been sent to appellant. Appellant did not deny the debt but sought instead to justify it.

2. Appellant was granted leave under D.C. App.R. 4(II)(a)(4) to file a notice of appeal 59 days after the decision of the trial court on a finding of excusable neglect; viz., that he was "proceeding pro se and did not have a lawyer's familiarity with the possible grounds for appeal and with the procedures

through which such grounds can be asserted." We conclude that the extention of time for filing an appeal was provident under the circumstances and that this court has jurisdiction of the appeal.

3. Bird was trading in futures contracts for which only a small margin is required. Each contract bought or sold short by Bird represented 50,000 pounds of copper at an average price of 65 cents per pound and was worth about $32,500. The margin required by DuPont was $2,000.

particular transactions was someone he had dealt with for a period of five months, he could not recall the name of the broker and had been unable to locate him. He produced no evidence to support a claim that he had sent DuPont written notice of his objections to the purchases to cover his short position and was, in general, unable to explain satisfactorily his actions with respect to the purchases on June 17.

In argument to this court Bird advances the principle that:

> Where a broker agrees, for a commission and on a deposit of a stipulated margin, to make a short sale for a client, he is bound to carry the stock for a reasonable time, as long as the margin remains intact . . . . [12 C.J.S. Brokers § 34 (1938).][4]

This principle can have no application here, however, where the question is one of authorization to purchase futures for his account and not the sufficiency of the existing margin.[5]

Affirmed.

4. Barber v. Ellingwood, 144 App.Div. 512, 129 N.Y.S. 414, 415–16 (1911).

5. If Bird's margin became insufficient and was not replenished on demand, DuPont would have been justified, had it been necessary, in closing the transactions in his account without his consent either by buying to cover short sales or selling where the securities had been bought on margin. [12 C.J.S. Brokers §§ 34, 33 (1938).]